JEFFREY A. TURNOY, OSB 124814
MARK C. COGAN, OSB 920167
1500 SW FIRST AVENUE, SUITE 780
PORTLAND, OR 97201
503-827-8092
email: jeff@coganlawoffice.com
ATTORNEYS FOR DEFENDANT

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.   3:21-CR-00227-SI-2 |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S SENTENCING |
| vs. | ) | MEMORANDUM |
| | ) | |
| KYLE LEE CERKONEY, | ) | |
| Defendant. | ) | |

This matter is pending for imposition of sentence on July 6, 2022. The purpose of this

pleading is to summarize the reasons we intend to present in favor of imposing a sentence below

the level which is being sought by the government, consistent with the considerations in 18

U.S.C. § 3553(a).

A.    INTRODUCTION

Mr. Cerkoney was charged by Information and pleaded guilty to one count each of the

crime of conspiracy to distribute 1,000 kilograms or more of marijuana, and conspiracy to

launder monetary instruments. He remains out of custody on this matter, and awaits imposition

of sentence.

B.    ADVISORY SENTENCING GUIDELINES BASE CALCULATIONS

The advisory Sentencing Guidelines, as outlined in the plea agreement, reference a Base

Offense Level of 30. See U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(c)(5). There is no

dispute that a 2-level increase applies for possession of a dangerous weapon in connection with

**DEFENDANT'S SENTENCING MEMORANDUM**                        **PAGE 1**

the offense. See id. at § 2D1.1(b)(1). There is no dispute that a 2-level increase applies for using

a premises for manufacture or distribution of controlled substances. See id. at § 2D1.1(b)(12). In

addition, there is no dispute that a 2-level increase applies for conviction of a money laundering

offense. See id. at § 2S1.1(b)(2)(B). Further, there is no dispute that a 3-level decrease applies

for acceptance of responsibility. See id. at § 3E1.1(b). Thus, the advisory guideline range, prior

to further adjustments, is level 33, which prescribes an advisory sentence of 168 to 210 months.

C.    DEPARTURES AND CRIMINAL HISTORY CALCULATION

Via the plea agreement, and based on Mr. Cerkoney's acceptance of responsibility, there

is no dispute that Mr. Cerkoney qualifies for a 3-level reduction for Acceptance of

Responsibility, resulting in an adjusted offense level of 33 from 36. See id. Nor is there any

dispute that Mr. Cerkoney has a criminal history category III, as he does have a modest criminal

history, but the score is increased as he was on probation at the time of the offense.

D.    RECOMMENDED SENTENCE

The Probation Department is seeking imposition of a sentence of 120 months in prison,

followed by 5 years of supervised release on count 1, and 3 years on count 2. The government

has agreed not to seek a prison sentence any higher than the low-end of the applicable guideline

range, which in this case starts at 168 months in prison. The government has agreed that a 4-level

departure based on 18 U.S.C. § 3553 is appropriate in this case, which brings the guideline level

down to 29, with a range of 108–135 months in prison. Prior to any additional adjustments, the

defense is permitted to seek a further 4-level downward departure or variance from the

government's recommendation, which puts the offense level at 25, with a range of 70–87 months

in prison. The plea agreement, and the law, do not require the Court to impose such a severe

sentence as recommended by the government and Probation Department. The defense urges the

Court to impose a sentence at the low-end of the guidelines from where the defense is permitted

**DEFENDANT'S SENTENCING MEMORANDUM**                                    **PAGE  2**

to argue, based on the following considerations.

E.    SENTENCING CONSIDERATIONS

Before going into the specific reasons calling for imposition of a sentence below the advisory Sentencing Guidelines range as recommended by the government and Probation Department, it is important to make some general observations. The advisory Sentencing Guidelines are *ab initio* the product not solely of careful analysis and consideration of empirical data, but they are also the consequence of political guessing. The crude methodology used to create the Sentencing Guidelines was one of simple arithmetic averaging and addition; the Sentencing Commission simply took the average national sentences for a given offense, and then increased the incarceration term, without explanation, much less scientific studies. See U.S. v. Jaber, 362 F. Supp. 2d 365 (D. Mass. 2005).

This methodology is painfully deficient as an intellectual exercise, and has the effect of compressing the varied actions of individuals and their attendant circumstances. In other words, the effect of averaging raises the floor for those whose criminality is relatively minimal and reduces the ceiling for those whose criminality is relatively greater. Combine this averaging with the wide variance associated with certain types of offenses, e.g. quantity defined drug offenses, and you have a further disassociation of considerations of the offender and the punishment imposed.

Mr. Cerkoney is 40 years of age. If given the sentence as recommended by the Probation Department, Mr. Cerkoney will be incarcerated until the age of 50. Under the recommendation of the government, Mr. Cerkoney will be approximately 49 years old when released. The outlook for, at the very least, a 49-year-old felon, just released from nearly a decade or more of prison, poses an interesting dichotomy– because of his age, he is less likely to re-offend, as recidivism

**DEFENDANT'S SENTENCING MEMORANDUM                    PAGE 3**

rates decline relatively consistently as age increases[1] (good), but his incarceration severely damages his prospects for social re-integration (bad)[2]. Most male inmates do not leave prison transformed into law-abiding citizens, but rather, the very skills an inmate develops to survive inside prison make him anti-social when released. An unintended consequence of incarceration to be sure, but not easily ignored.

Perhaps, given the unscientific nature of the formulation of the Sentencing Guidelines, the physician's credo *primum non nocere* ("Above all, do no harm"), may offer some perspective. This simple phrase reminds the physician that s/he must consider the possible harm that any intervention might do. It is invoked when debating the use of an intervention that carries an obvious risk of harm but a less certain chance of benefit. Historically, this phrase has been for physicians a hallowed expression of hope, intention, humility, and recognition that human acts with good intentions may have unwanted consequences.

In addition, as a global consideration, criminal justice reform has been and continues to be a major topic of political discussion. As American mass incarceration has been increasingly criticized, legislation has been crafted and executed to create reasonable and much-needed change to reflect not only the changing attitudes of those in power, but also to put measures into place that enable pro-social reform. There has been no greater example of this than with the passing and implementation of the First Step Act, signed into law in December of 2018.

---

[1] UNITED STATES SENTENCING COMMISSION, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES, at 12, 28 (2004), http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf.

[2] Testimony of Pat Nolan, Vice President of Prison Fellowship to The Joint Economic Committee of the U.S. Congress "Mass Incarceration in the United States: At What Cost?" October 4, 2007.

**DEFENDANT'S SENTENCING MEMORANDUM**　　　　　　　**PAGE 4**

As former President Trump stated in April of 2019, "Americans from across the political spectrum can unite around prison reform legislation that will reduce crime while giving our fellow citizens a chance at redemption." THE WHITE HOUSE, PRESIDENT DONALD J. TRUMP IS COMMITTED TO BUILDING ON THE SUCCESSES OF THE FIRST STEP ACT (2019), *available at* https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-committed-building-successes-first-step-act/. The First Step Act provides for greater earned time, rehabilitative programs, more availability for home-detention, and other reforms, including certain changes to mandatory-minimum sentences. Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person (First Step) Act, S. 756, 115 Cong. §§ 101, 401–613 (2018).

While the provisions of the First Step Act do not directly apply to Mr. Cerkoney and this particular case, the broader context of Federal sentencing and these recent reforms advise us that sentences should be reduced, programs should be made available, and the days of simply locking offenders away should be a relic of the past. It is within this enlightened context that Mr. Cerkoney stands to be sentenced.

F.      GROUNDS FOR ADDITIONAL DOWNWARD ADJUSTMENT OF SENTENCE

Pursuant to 18 U.S.C. § 3553(a), the Court is required to "impose a sentence sufficient, but not greater than necessary," to advance the sentencing policies and objectives which are provided by law. The sentencing criteria include the need to reflect the seriousness of the offense, to promote respect for the law, to provide for just punishment, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

**DEFENDANT'S SENTENCING MEMORANDUM                    PAGE 5**

The plea agreement authorizes Mr. Cerkoney to request additional downward adjustments of his sentence, beyond those to which the government has stipulated and recommended. We urge the Court to adjust the sentence downward to the levels which the Defense is permitted to ask for, based on a combination of factors, including the sentencing policies which are established in 18 U.S.C. § 3553(a).

### 1. The Advisory Guideline is too Harsh, Excessive, or is "Greater than Necessary," and the Purpose of Sentencing is Satisfied by a Below-Guideline Sentence[3]

> Too many people go to too many prisons for far too long for no good law enforcement reason. It is time to ask ourselves some fundamental questions about our criminal justice system. Statutes passed by legislatures that mandate sentences, irrespective of the unique facts of an individual case, too often bear no relation to the conduct at issue, breed disrespect for the system, and are ultimately counterproductive. It is time to examine our systems and determine what truly works.

Eric Holder, former U.S. Att'y Gen, Address at the 15th Annual National Action Network Convention (Apr. 04, 2013), *available at* http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130404.html.

Retired United States Supreme Court Justice Anthony Kennedy has stated on several occasions that the guidelines are too harsh, sentences too long, the guidelines should be revised downward, and the fact that there is a lobby for higher penalties is "sick". See Anthony Kennedy, U.S. Supreme Court J., *Judicial Security and Independence*, C-SPAN (Feb. 14, 2007), http://www.c-spanvideo.org/program/196657-1; Anthony Kennedy, U.S. Supreme Court J., Address at the Ninth Circuit Judicial Conference (July 09, 2006), *available at*

---

3  See U.S. v. Rita, 551 U.S. 338, 351 (2007) (the judge "may hear arguments by prosecution or defense that the Guidelines sentence should not apply...because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations or perhaps because the case warrants a different sentence regardless.").

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 6**

http://www.talkleft.com/story/2006/07/11/842/04331/inmatesandprisons/Justice-Kennedy-Calls-Efforts-to-Increase-Sentences-Sick-; Anthony Kennedy, U.S. Supreme Court J., Address at the ABA Annual Conference (Aug. 09, 2003), *available at* http://www.abanow.org/2003/08/speech-by-justice-anthony-kennedy-at-aba-annual-meeting/; see also Kimbrough v. U.S., 552 U.S. 85, 111 (2007) (district court's below guideline sentence in drug case not unreasonable because "it appropriately framed its final determination in line with §3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary to accomplish the goals" of sentencing.); see also U.S. v. England, 966 F.2d 403, 410 (8th Cir. 1992) (Bright, J., concurring) (Although not illegal, the "draconian" sentences in this methamphetamine case "emanate from a scheme gone awry."); U.S. v. Dossie, 851 F. Supp. 2d 478, 483 (E.D. N.Y. 2012) ("the drug-offense Guidelines ranges are excessively severe. In formulating those ranges, the Commission decided to jettison its pre-Guidelines data and instead chose to make the sentencing range in every single drug case proportional to the onerous mandatory sentences meant only for leaders and managers.").

The advisory guideline via the plea agreement in this case, prior to additional adjustments, calls for a sentence between 108 and 135 months in prison, via the government's recommendation. The government is recommending no more than 108 months, and the Probation Department is recommending 120 months. The guideline range the defense is permitted to argue for is between 70 and 87 months in prison. As such, pursuant to the statutes, guidelines, and the recommendations, Mr. Cerkoney is going to prison for many years. The defense submits that the guidelines and recommendations of the government and probation department are overly harsh, excessive, and "greater than necessary" to achieve the purposes of sentencing.

**DEFENDANT'S SENTENCING MEMORANDUM**                         **PAGE 7**

Imprisonment as prescribed by the guidelines, and as recommended by the government and Probation Department, would not reasonably accomplish any of the legitimate sentencing objectives, as Mr. Cerkoney appropriately understands the nature of his misdeeds, is ready to move away from the life he has previously led, and he has the desire to engage in community good works and building his business to prevent any future re-offending. He very much desires a successful life outside of prison walls. A guideline sentence, as well as the sentences recommended by the government and Probation Department, would only accomplish an objective of retributive punishment. Therefore, a sentence below that recommendation, and more towards what the defense is seeking, is warranted.[4]

### 2. The Drug Guideline Lacks an Empirical Basis, Relies too Heavily on Quantity, and Mr. Cerkoney's Role in the Offense Compared to Co-Defendants should be Taken into Consideration[5]

The sentencing guidelines for drug crimes are not based on empirical scientific evidence and rely too heavily on quantity and type of drug as opposed to role in the offense. These facts have been grounds for downward-departures. See Gall v. U.S., 552 U.S. 38, 46 n.2 (2007) (noting that not all of the guidelines are tied to empirical evidence; most notably, those guidelines for drug offenses); U.S. v. Dayi, 980 F. Supp. 2d 682, 687–90 (D. MD. 2013) (in

---

4 See U.S. v. Haynes, 557 F. Supp. 2d 200, 202–03 (D. Mass. 2008) ("While public safety certainly calls for the incapacitation of some, there is another side to the equation, which, after [Booker] may finally be given the serious consideration it deserves….Courts may no longer ignore the possibility that the mass incarceration of nonviolent drug offenders has disrupted families and communities and undermined their ability to self-regulate, without necessarily deterring the next generation of young men from committing the same crimes.") (alteration added).
5 See Patti B. Saris, Chief Judge, Chair of the United States Sentencing Comm'n, Speech at the Georgetown University Law Center, "A Generational Shift for Drug Offenses" (Mar. 26, 2014), available at https://www.ussc.gov/sites/default/files/pdf/training/online-learning-center/supporting-materials/Saris-Georgetown-Law-Center-Speech-20140326.pdf) ("This real-life experience in the states, together with new academic research, has begun to indicate that drug sentences may now be longer than needed to advance the purposes for which we have prison sentences, including public safety, justice, and deterrence….With a generation gone by since the current federal sentencing structure was put into place, and much experience and data now to guide us, we are overdue as a society and as a federal criminal justice community to reconsider our approach to federal drug sentencing.").

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 8**

large-scale conspiracy to distribute marijuana (over 1,000 kilograms), Court imposed a downward variance of 2-levels for each defendant, in large part, due to State decriminalization of marijuana and Federal policies of non-enforcement. Court explained that the seriousness of marijuana offenses has been called into question amid policy expansion and decriminalization, and the drug guidelines overstate the seriousness of such offenses in the current climate)); Dossie, 851 F. Supp. 2d at 480–81 ("right from the start Congress made a mistake… The severe sentences it mandated to punish specified *roles* in drug-trafficking offenses were triggered not by role but by drug type and quantity instead. If it wanted the statute to serve its explicitly stated purpose, Congress should have said that an offense gets the 5-to-40 sentence enhancement when the defendant is proved to be a manager of a drug business. Instead, the 5-to-40 sentence enhancement is triggered by offenses involving 28 grams of crack, 100 grams of heroin, or 500 grams of cocaine…. Drug quantity is a poor proxy for culpability generally and for a defendant's role in a drug business in particular.") (emphasis in original); U.S. v. Thomas, 595 F. Supp. 2d 949, 952 n.1 (E.D. Wisc. 2009) ("Commentators have long criticized the guidelines' heavy reliance on drug weight rather than the defendant's role in the offense.").[6]

In the present case, the guidelines calculation is largely based on the Drug Quantity Table outlined in § 2D1.1(c) of the sentencing guidelines. That table prescribes offense levels for drug crimes based on the quantity of a certain drug possessed/manufactured/distributed, etc. In Mr. Cerkoney's case, he plead guilty to conspiracy to distribute 1,000 kilograms or more of marijuana.

---

6 This Court may also depart based on a policy disagreement with the guidelines, and not simply based on the individualized determination that the guidelines yield an excessive sentence in a particular case. Spears v. U.S., 555 U.S. 261, 264 (2009); Kimbrough v. U.S., 552 U.S. 85, 101 (2007).

**DEFENDANT'S SENTENCING MEMORANDUM**                                        **PAGE 9**

A look to the Drug Quantity Table reveals that such amount is punished by an offense level of 30; at least 1,000 KG but less than 3,000 KG of marijuana. While marijuana certainly is treated differently in the guidelines than other substances (in terms of how much of the substance gets you a certain guideline level), the driving force in the leveling remains quantity.

Mr. Cerkoney has no prior felony criminal convictions, and with no other aggravating factors, his advisory guideline sentence for offense level 30 would be 121 to 151 months in prison. That is a shocking and grotesque amount of time for a distribution of what could soon become a lawful substance under Federal law. Significantly, a substantial number of States, including Oregon, have downgraded the punishment for marijuana offenses.

The guideline sentence prescribed for Mr. Cerkoney, which is based on the Drug Quantity Table, lacks an empirical scientific basis. The table has been criticized time and time again as being way over-the-top, and not proportional to the conduct at issue. Former United States Attorney General Eric Holder endorsed the Sentencing Commission's proposal (which was adopted as an amendment in April of 2014) to lower the drug guidelines by two-levels. See UNITED STATES DEPT. of JUST., ATTORNEY GENERAL HOLDER URGES CHANGES IN FEDERAL SENTENCING GUIDELINES TO RESERVE HARSHEST PENALTIES FOR MOST SERIOUS DRUG TRAFFICKERS (Mar. 13, 2014), *available at*: http://www.justice.gov/opa/pr/attorney-general-holder-urges-changes-federal-sentencing-guidelines-reserve-harshest. It is worth noting that even this Nation's highest law-enforcement authorities agree that the drug guidelines do not fit the crimes committed.

In addition, Mr. Cerkoney acted mostly as a middleman on the shipping end of the conspiracy. He was not a manufacturer or producer of the marijuana. A co-defendant in the

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE  10**

conspiracy, Jeremy Cruz[7], was the leader or organizer of the conspiracy. Mr. Cruz set up the deals, where the product was to be shipped, and how much money was to be made off the transactions, while Mr. Cerkoney handled the logistics in shipping. As such, in his role as a middleman, Mr. Cerkoney's guidelines should be departed or varied downward in order to reflect his role compared to that of co-defendants instead of how much of the substance he happened to ship over time. See U.S. v. Jimenez-Gutierrez, 491 F. 3d 923, 924, 926 (8th Cir. 2007) (upholding District Court's substantial variance in drug case in part based on fact there were unindicted co-conspirators who played a much larger role than the defendant in the conspiracy and who deserved more time than the defendant).

Therefore, a sentence below the recommendations of the government and Probation Department is warranted.

### 3. This is Mr. Cerkoney's First Felony Conviction, His Criminal History Overstates His Propensity to Commit Crimes, and He is Unlikely to Reoffend

A downward-departure or variance from the applicable sentencing guideline is appropriate when the defendant has little to no criminal history. The length of time until a defendant's first conviction should also be considered. See U.S. v. Collington, 461 F. 3d 805, 808 (6th Cir. 2006) (in drugs and firearms case, where guidelines prescribed 188–235 months, variance down to 120 months reasonable in part due to defendant's age at time of conviction, and that his criminal history was over-stated by the guidelines). The likelihood that the defendant will engage in future criminal conduct is a central factor that district courts must assess when imposing a sentence. Pepper v. U.S., 562 U.S. 476, 492, 131 S. Ct. 1229, 1242 (2011). In

---

7 Mr. Cruz was sentenced on February 4, 2022 to 21 months in prison. Another co-defendant, Robert Kawika Dawe, was sentenced on April 11, 2022 to 33 months in prison. It should be noted that Mr. Kawika Dawe has an extensive criminal history, including multiple prior felony convictions, placing him in category IV.

**DEFENDANT'S SENTENCING MEMORANDUM**                                    **PAGE 11**

addition, a defendant's age and reduced risk of recidivism are grounds for low-end and below guideline sentences. See U.S. v. Smith, 275 F.App'x 184, 186 (4th Cir. 2008) (in child pornography case where guideline sentence was between 78 and 97 months, downward departure to 24 months warranted due to the defendant's advanced age, having avoided violations of law until 64 years of age, and the absence of any risk of recidivism).

Mr. Cerkoney is 40 years old. While Mr. Cerkoney does have a few misdemeanor convictions from his past, the instant case constitutes his first felony criminal conviction. The fact that he has avoided a felony until his 40s is grounds for a downward departure or variance from the guidelines.[8]  Further, prison time is more significant for a first-timer who has not experienced prison than for a defendant who continues to reoffend and be imprisoned. See U.S. v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

Mr. Cerkoney has prior convictions for misrepresentation of age by a minor in 2002, assault in the fourth degree and contempt of court in 2016, and false information on transfer of a firearm in 2019. Mr. Cerkoney was on supervision for the firearm-related charge when the instant offense was committed. While certainly each of Mr. Cerkoney's prior convictions is serious, Mr. Cerkoney has never spent significant time in custody. In fact, in looking at the judgments of conviction, it does not appear Mr. Cerkoney was sentenced to jail time for any of

---

[8] It should be noted that the stigma of a felony conviction is permanent and pervasive, and irreparably damages a person's reputation. U.S. v. Wulff, 758 F. 2d 1121, 1125 (6th Cir. 1985); U.S. v. Smith, 683 F. 2d 1236, 1240 n.13 (9th Cir. 1982) (internal citation omitted).

**DEFENDANT'S SENTENCING MEMORANDUM**                          **PAGE 12**

his past convictions, thereby again making this first-time felony conviction with incarceration more severe under the circumstances.

Furthermore, although he pleaded guilty in the assault case, Mr. Cerkoney registered certain objections to the pre-sentence report regarding this conviction, so that his version of the facts would be on record. Mr. Cerkoney ultimately followed the advice of his attorney in that case, accepted responsibility, and pleaded guilty. However, Mr. Cerkoney denies certain aspects of the facts of the assault case, including whether he "choked" the victim, Martha Arrambide. During the investigation in that case, Mr. Cerkoney heard the interaction between Ms. Arrambide and the police, and only after the police threatened Ms. Arrambide with prosecution and losing her daughter did she make any accusations against Mr. Cerkoney. With that said, Mr. Cerkoney did plead guilty, and had no violations of probation.

In addition, it should be noted that the firearm transfer conviction was related to an attempted purchase of a firearm as a gift for his step-father. As related in the pre-sentence report, Mr. Cerkoney maintains that he checked the wrong box on the firearms application by mistake. He knew that he was subject to a background check, and knew that he himself was prohibited from possession or purchase for himself of a firearm. Mr. Cerkoney was unaware, however, that he could not purchase a firearm for someone else. As a result of that matter, Mr. Cerkoney was more fully informed regarding the restrictions for firearms due to his assault conviction. Mr. Cerkoney accepted responsibility, and pleaded guilty. Although Mr. Cerkoney was on probation for part of the instant offense, he has been off of supervision since approximately January of 2021, and received no probation violations in that case.[9]

---

9  In any of his State cases, Mr. Cerkoney has never received a violation of probation. He also successfully completed the DUII Diversion Program for his case in 2007.

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE  13**

Further, although Mr. Cerkoney is by no means of advanced age or elderly, the fact that he is now in his 40s makes him less likely to re-offend. Mr. Cerkoney is outside of the "prime" years for committing criminal offenses. The statistics show that a defendant in his 20s and 30s is more likely to re-offend than a defendant in his 40s, 50s, and beyond. UNITED STATES SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES, at 12, 28 (2004), http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf. Moreover, Mr. Cerkoney has stable housing, familial support, and has been able to maintain employment in some capacity throughout the duration of this case. All of these factors militate towards a minimal risk of re-offending.

As such, Mr. Cerkoney's criminal history overstates his propensity to commit crimes. In consideration of Mr. Cerkoney's criminal history, his first felony conviction through the instant case, and his minimal risk of re-offending, a downward-departure or variance from the guidelines is appropriate.[10]

### 4. Mr. Cerkoney's Tragic Personal History

The tragic personal history of a defendant is grounds for a downward departure. U.S. v. Lopez, 938 F.2d 1293, 1295, 1298–99 (D.C. Cir. 1991) (case remanded for consideration of defendant's tragic history, which included exposure to extreme domestic violence, growing up in the slums, and defendant's father murdering his mother).

---

[10] See U.S. v. Robertson, 662 F.3d 871, 879 (7th Cir. 2011) (recognizing that, at times, even a within guidelines sentence may be inappropriately high when reliable information indicates that the defendant's criminal history category substantially over-represents the propensity to commit crimes).

**DEFENDANT'S SENTENCING MEMORANDUM**          **PAGE 14**

As explained to the Probation Department, Mr. Cerkoney was subjected to abuse and neglect during his early childhood. His parents divorced before Mr. Cerkoney can remember, and for a time he lived with his father. Once his mother remarried, she obtained full custody of Mr. Cerkoney, and his step-father was physically abusive towards himself and his mother. His step-father's usual response for discipline was to strike Mr. Cerkoney, and/or to neglect him for periods of time. Due to the abuse of himself and his mother, Mr. Cerkoney's mother divorced the step-father and his mother remarried another time when Mr. Cerkoney was about age 12. From then on, Mr. Cerkoney's childhood was without abuse. Mr. Cerkoney last spoke to his father in 1999, when during an argument, his father became physically aggressive, and Mr. Cerkoney cut all ties after that.

The early exposure to domestic violence and physical abuse during Mr. Cerkoney's upbringing warrants a departure or variance from the guidelines and the recommendations of the government and Probation Department, to adequately reflect Mr. Cerkoney's struggles during early childhood.

### 5. Mr. Cerkoney's Medical Needs Should be Considered

Pursuant to 18 U.S.C. § 3553(a)(2)(D), one of the considerations in fashioning a sentence is to need to provide the defendant with needed medical care. As stated in the guidelines, "[p]hysical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." U.S. SENTENCING GUIDELINES MANUAL § 5H1.4 (alteration added).

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 15**

Although Mr. Cerkoney may outwardly appear to be in good physical health, he has medical conditions that have caused him to be in very poor health. One of the conditions is ulcerative colitis. In order to appropriately treat the condition, Mr. Cerkoney has an extremely restrictive diet. Not abiding by the dietary restrictions causes extreme pain and stomach issues. As reflected in the pre-sentence report, Mr. Cerkoney cannot eat dairy, gluten, red meat, uncooked vegetables, or foods that are high in acid or starch. Unfortunately, the food offered in prison is not particularly nutritious, is high in starch and fat, and will otherwise be averse to Mr. Cerkoney's diet. Because of this, Mr. Cerkoney is very likely to experience harsher conditions of incarceration than others might, given that the food options available are highly likely to cause him pain and medical complications.

In addition, during the COVID-19 pandemic, Mr. Cerkoney was hospitalized with the COVID-19 virus, pneumonia, and rash. He was in the hospital for 14 days and was on a respirator for 5. He was informed by staff that had he not gotten to the hospital when he did, he most likely would have died. Mr. Cerkoney now requires an inhaler at virtually all times, as he has permanent lung damage, among other ailments, from the virus.[11] Constantly needing an inhaler is further going to complicate his time in custody.

Therefore, in consideration of the medical care Mr. Cerkoney requires, and that the conditions of prison will likely be more severe because of those conditions, a departure or variance from the recommendations of the government and Probation Department is warranted.

---

11 Having interacted with Mr. Cerkoney both pre and post-virus, Counsel can attest that Mr. Cerkoney's medical condition took a substantial turn once he contracted the virus, with the breathing issues being the most outwardly apparent.

**DEFENDANT'S SENTENCING MEMORANDUM**        **PAGE 16**

**6. Mr. Cerkoney's Employment History, Current Employment and Effect on the Company should be Considered**

A defendant's employment history can be considered in fashioning the appropriate sentence under 18 U.S.C. § 3553(a). See U.S. v. Ruff, 535 F. 3d 999, 1001 (9th Cir. 2008) (affirming below-guidelines sentence in part based on the defendant's "history of strong employment."); U.S. v. Baker, 445 F. 3d 987, 992 (7th Cir. 2006).

Further, the loss of one's business will affect not only Mr. Cerkoney, but the company he works for and the owner. This has also been a factor considered in departing or varying from the guidelines. See U.S. v. Tomko 562 F. 3d 558, 571–72 (3d Cir. 2009) (en banc) (where defendant convicted of tax evasion and guidelines 12-18 months, sentence of probation and home detention not unreasonable, in part, in light of the harm that would be caused to defendant's business and more than 300 employees); U.S. v. Olbres, 99 F. 3d 28, 36 (1st Cir. 1996) (guidelines do not prohibit consideration of job loss to the defendant or innocent employees).

As reflected in the pre-sentence report, Mr. Cerkoney has had a consistent work history as an adult. Mr. Cerkoney is currently the Chief Operating Officer for Aetherium Automotive, LLC (hereinafter "Aetherium"), which is a pre-owned performance car dealership located in N.E. Portland. A letter from Aetherium is included in our submission to the Court. It is a relatively new business, and Mr. Cerkoney started working for the business when it was in its incorporation and promotion stage. Aetherium is a small business with two full-time employees, one of which is Mr. Cerkoney, but is looking to expand. Among other tasks, Mr. Cerkoney is in charge of marketing and sales.

Aetherium has been constantly hiring independent contractors and local service providers and generating numerous indirect employment opportunities in the Portland-Metro area.

**DEFENDANT'S SENTENCING MEMORANDUM**          **PAGE 17**

Aetherium has been supporting numerous local businesses and workers as well by spending thousands of dollars for regular cleaning service, auto body works, auto mechanic works, auto detailing, window tinting, window replacement, tire replacement, auto lifting, performance vehicle body wrapping, local auto auctions, online marketing services, security service, company merchandise production, and more. Aetherium is located in the Airport Business Center, and has generated revenue and a positive influence for the local economy and community.

Although in its relative infancy, Aetherium has been highly successful, and Mr. Cerkoney is a large part of that, as he has brought his connections in the performance car industry with him to Aetherium. Mr. Cerkoney has over a decade of experience in the auto industry, and has a background in freight brokage, auto insurance, auto sales, and motor racing, which brings a unique and well-rounded history to the fledgling company.

As Mr. Cerkoney faces the reality of not being employed with Aetherium once sentenced, the company is likely to struggle, if not potentially collapse, as a result of Mr. Cerkoney's incarceration. As noted, Aetherium is a small company, and Mr. Cerkoney's duties will fall to the other principal in the company, Yeun Roh, who does not have the type of experience or connections that Mr. Cerkoney does. The success of the company to this point has primarily fallen to Mr. Cerkoney, as he is the employee who brings in inventory and finds buyers.

Based on the foregoing, a departure or variance from the recommendations of the government and Probation Department is warranted to reflect Mr. Cerkoney's otherwise solid work history, and the impact his incarceration will have on innocent third-parties.

### 7. Probation Office Recommends a Below-Guideline Sentence

Where the Probation Department recommends a sentence below the applicable guidelines range, a departure is warranted to reflect such recommendation. See U.S. v. Willis, 479 F. Supp.

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE  18**

2d 927, 937 (E.D. Wisc. 2007) (where guidelines range 120 months, and 60-month statutory maximum, downward departure to one year and one day in prison reasonable in part because sentence consistent with the recommendation of the probation officer, whose view of the offense and the offender were taken into account); U.S. v. Hein, 463 F. Supp. 2d 940, 943 (E.D. Wisc. 2006) (in felon in possession of ammunition case, and guidelines 12-18 months, a sentence of probation was appropriate in part due to the recommendation of the probation officer, especially since a probation department recommendation of no incarceration is "quite rare.").

The Probation Department is recommending a sentence of 120 months in prison. That is a 3-level variance from the sentencing guidelines as outlined in the Pre-Sentence Report. U.S. Probation Officer Jessica Lehmann provided a detailed explanation for the variance in the Pre-Sentence Report. Probation Officer Lehmann took into account the seriousness of the offense, but also acknowledged Mr. Cerkoney's upbringing which included early exposure to alcohol abuse and domestic violence, as well as Mr. Cerkoney's own physical and emotional abuse, among the other factors listed in 18 U.S.C. § 3553(a). All of these factors, and others, being taken into consideration, it is the view and recommendation of Probation Officer Lehmann that a sentence of 120 months is appropriate.

Therefore, given that the Probation Department is recommending a below-guideline sentence, we urge the Court to depart or vary downward from the guidelines.

## 8. Defendant's Good Deeds Should be Considered

Where a Defendant has engaged in charitable or otherwise good deeds to an exceptional degree, such acts warrant consideration for a departure or variance from the guidelines. See U.S. v. Thavaraja, 740 F. 3d 253, 259–260 (2d Cir. 2014) (where defendant convicted of conspiring to provide support to terrorist organization and guidelines 240 months, court's sentence of 108

**DEFENDANT'S SENTENCING MEMORANDUM**                      **PAGE 19**

months not unreasonable in part because for the six years he was incarcerated he was a model prisoner who tutored other prisoners.); U.S. v. Serafini, 233 F. 3d 758, 773–74 (3d Cir. 2000) (in perjury case where defendant was a state legislator, three-level departure for community and charitable activities justified as the community acts were extraordinary and exceptional); U.S. v. Adelson, 441 F. Supp. 2d 506, 513–14 (S.D. N.Y. 2006) (in securities fraud case, where guidelines call for life sentence, court imposes 42 month sentence in part because of the defendant's past integrity and many good deeds. "But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'").[12]

In 2021, Mr. Cerkoney co-founded a nonprofit organization called "Field of Prayers." The mission of the organization is to assist veterans with spiritual guidance, thanks, and donations. Mr. Cerkoney's Pastor, Hai Chun Jung, provided a letter on Mr. Cerkoney's behalf and which is included in our submission. Pastor Jung is a Senior Pastor at Hope Korean Presbyterian Church of Portland, and he has known Mr. Cerkoney for nearly 10 years.

Field of Prayers assists veterans with mental, emotional, and spiritual wounds as a result of time spent in the military. Mr. Cerkoney recognized a need for assistance, and approached

---

12 See also U.S. V. Tomko, 562 F. 3d 558, 572–73 (3d Cir. 2009) (affirming probationary sentence in tax evasion case, in part, based on the defendant's charitable good works); U.S. v. Rioux, 97 F. 3d 648, 663 (2d Cir. 1996) (affirming downward departure in mail fraud case based on charitable fund-raising conduct as well as poor medical condition).

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE 20**

Pastor Jung to co-found Field of Prayers. Hundreds of Bibles have been ordered for distribution, and "thank you" cards are being prepared for Independence Day celebrations. The organization is working on t-shirt donations as well for those in need. That activity is being conducted with the Veterans Affairs Medical Center in Portland.

Although Field of Prayers is relatively new, its mission is respectable and its activities commendable. Mr. Cerkoney has been dedicated to seeing the organization help some of the most vulnerable and needy, with his time and efforts.

Therefore, Mr. Cerkoney's good works in assisting veterans, in combination with other relevant factors (such as employment history), are extraordinary and exceptional to a degree as to warrant a departure or variance from the guidelines.

### 9. The Need to Avoid Unwarranted Sentencing Disparities Among Co-Defendants

Pursuant to 18 U.S.C. § 3553(a)(6), one consideration in imposing a sentence is the need to avoid unwarranted disparities in sentences among co-defendants. Additional factors include the conduct co-defendants are sentenced for, and the similarities in criminal records. 18 U.S.C. § 3553(a)(6); see United States v. Villarreal, 725 Fed. Appx. 515 (9th Cir. 2018) (applying 18 U.S.C. § 3553(a)(6)).

Two co-defendants were charged as part of the conspiracy Mr. Cerkoney was part of; Jeremiah Cruz, and Robert Kawika Dawe. Mr. Cruz was sentenced by this Court on February 3, 2022 to 21 months in prison, and Mr. Kawika Dawe was sentenced on April 11, 2022 to 33 months in prison.

Regarding Mr. Cruz, although he has a lower criminal history as compared to Mr. Cerkoney and Mr. Kawika Dawe, his conduct in the conspiracy can best be characterized as a leader or organizer; beyond the conduct of Mr. Cerkoney. Without Mr. Cruz and his contacts in

**DEFENDANT'S SENTENCING MEMORANDUM**                     **PAGE 21**

the "industry," the conspiracy could not have taken place. Mr. Cruz is primarily who set up the deals and determined where product was going to be shipped, while Mr. Cerkoney handled shipping and logistical matters. Although Mr. Cruz, Mr. Cerkoney, and Mr. Kawika Dawe each had substantial roles in the offense, Mr. Cerkoney acted upon the information gained from Mr. Cruz.

Regarding Mr. Kawika Dawe, although his role may possibly be considered less than that of Mr. Cruz and Mr. Cerkoney, his criminal history is far greater, and more serious, than Mr. Cerkoney's history. As reflected in the pre-sentence report for Mr. Kawika Dawe, he is a criminal history category IV. Mr. Kawika Dawe has criminal convictions from 8 prior cases, including several felonies. His felony convictions range from class C to class A felonies, including burglary in the first degree, attempting to elude police officers, theft, and drug possession; among other convictions. Mr. Kawika Dawe's criminal history, as an adult in Oregon, ranges from 2003 to 2017, and unlike Mr. Cerkoney, Mr. Kawika Dawe has served prior jail and prison sentences. While Mr. Kawika Dawe does not have the sentencing enhancements that are applicable to Mr. Cerkoney, his criminal history is far worse than Mr. Cerkoney's history.

Even if this Court imposes a sentence at the low-end of the guideline range that the Defense is permitted to argue for (70 months), Mr. Cerkoney faces a sentence that is more than double that of Mr. Kawika Dawe, and more than triple that of Mr. Cruz. While certain enhancements do not apply to Mr. Kawika Dawe, and Mr. Cruz's criminal history is less than that of Mr. Cerkoney's, the need to avoid unwarranted disparities in sentencing Mr. Cerkoney for similar conduct as his co-defendants is particularly at issue in this case.

**DEFENDANT'S SENTENCING MEMORANDUM**          **PAGE 22**

Therefore, we respectfully urge this Court to impose a sentence that does not run afoul of 18 U.S.C. § 3553(a)(6).

**<u>10. Mercy</u>**

Mr. Cerkoney seeks the mercy of this Court. American sentences have been characterized as particularly long, harsh, and lack an individualistic character to them; causing courts to treat offenders as less than human beings. These were the sentiments of United States Supreme Court Justice Anthony Kennedy in 2007, when he expressed these feelings to the United States Senate Judiciary Committee. <u>See also</u> JAMES Q. WHITMAN, HARSH JUSTICE 19, 223 n.72 (2003) ("American punishment is comparatively harsh, comparatively degrading, comparatively slow to show mercy," "the makers of sentencing guidelines succeeded only in contributing to the making of a law of punishment that shows obstinately little concern for the personhood of offenders...a law that tends to treat offenders as something closer to animals than humans, and that has correspondingly sought, more and more frequently, simply to lock them away.").

Despite being listed in category III, Mr. Cerkoney has no prior felony criminal convictions. Mr. Cerkoney endured an unfortunate upbringing during his early years, and has recently suffered through multiple medical ailments that will make incarceration more difficult than normal. If he is given the sentence of 70 months in prison, Mr. Cerkoney would be in his mid-40s upon release, which is an age outside of the heartland of criminal activity. Mr. Cerkoney is capable of success as evidenced by his previous employment history, building Aetherium Automotive from the ground up, and engaging in community good works. Mr. Cerkoney has constantly discussed the future and how he wants to live his life once his incarceration term is over. He is done with the drug trade; he wants better for himself and those he cares about. As

**DEFENDANT'S SENTENCING MEMORANDUM**                              **PAGE 23**

such, Mr. Cerkoney seeks the mercy of this Court to sentence him below the guidelines, given all the facts and circumstances.

G.    <u>CONCLUSION</u>

Mr. Cerkoney has done wrong and has engaged in regrettable activities in the marijuana trade. Mr. Cerkoney is ready and able to leave that part of his life behind, and build a better life for himself and those he cares about. Mr. Cerkoney's history indicates that he has the capacity to do better, and be productive to society.

When one considers the policies enacted as part of 18 U.S.C. § 3553(a), there are more than ample grounds to impose a sentence below what the guidelines prescribe, and below the recommendations of the government and Probation Department. Such is consistent with §3553(a), Mr. Cerkoney's individual characteristics, his needs for medical treatment, his overstated criminal history, his good deeds, and personal history, and such a sentence promotes respect for the law, unwarranted disparities with co-defendants, and provides sufficient punishment. A sentence below the guidelines and recommendations adequately achieves the purposes of sentencing. Therefore, we respectfully request that this Court impose a sentence below what is prescribed by the guidelines, and what is recommended by the government and Probation Department.

DATED:    Portland, Oregon
          June 29, 2022

<u>s/d Jeffrey A. Turnoy</u>
JEFFREY A. TURNOY
MARK C. COGAN, P.C. OSB# 124814
Attorney for Defendant

**DEFENDANT'S SENTENCING MEMORANDUM**                    **PAGE  24**